May it please the court. My name is Ron Kuby and this case presents two questions. The first is whether the district court incorrectly designated the offense of reckless manslaughter as a grade A offense for purposes of the sentencing guidelines. And the second is whether the near exclusive focus at sentencing on the facts and circumstances and sequelae and proceeding itself procedurally unreasonable. To take the first one first, there does seem to be at least tacit agreement that the defense, the prosecution, the probation department, and the district court in sentencing Ms. Ramos all relied on an incorrect, outdated guideline from 1988. And we all collectively were unaware that that guideline had been changed in 2016 to include only voluntary manslaughter rather than all the other types of manslaughter. And the government, I mean, they haven't expressly eschewed reliance on that, but they sort of shifted to a different rationale, which we see in footnote 11. So we can find a footnote 11 in their brief where they're arguing that the residual clause of 7B1A1B, which I'll just call subsection B so as not to take up too much time, that that residual clause, which provides for a grade A designation for any offense punishable by more than 20 years should apply here. And what the government wants to do is simply read in, ask this court to read in the words or offender into that clause. So instead of simply saying offense, it says offense or offender. And there's no reason why this court should ignore the clearer language of the guidelines. And that's where we start, right, as a matter of construction, start with the language. There's no ambiguity in the word offense. And that's especially true given the structure of the guidelines. Well, excuse me, Mr. Kirby, suppose the New York law took the following form. It said, it is a crime to do whatever reckless homicide definition they have. And subsection A, the penalty for that is up to 10 years in prison. And subdivision B, if the offender, if the defendant has a prior conviction of whatever sort, it jumps up to 25 years. Would you still be saying that that is not part of the offense definition? Not very persuasively. Yeah. So I thought you would say that because that's that seems the reasonable thing to say. And so the question is, it's a matter of form that the state, instead of defining two subsections within the statutory offense definition, has an overarching enhancement provision that applies to all or most or many or some offenses, including this one. Is that the problem that makes it an offender characteristic rather than part of the precisely, it's a question of form. And I would refer to Trotter and all the Trotter progeny cases. There's a reason why all of those cases were decided under 21 USC 844A, which in fact has the very scheme that you're talking about, where in the very definition of the offense, in fact, in the very same subsection, but in different clauses, it prescribes a penalty for first offense, which is misdemeanor level, giving everybody a break for simple marijuana and enhances it further. And what I would argue there is that Congress, in essence, chose to collapse offender and offense into a single subsection. And that's something that Congress most clearly did, for example, in 922G, felon in possession, where you can't even get to an offense without considering the underlying crime of conviction, the underlying felony. But the fact that Congress did that, which is Congress's prerogative, doesn't mean that's how we interpret statutes where Congress or the state legislature has not spoken, has spoken in a very, very different fashion. So I wouldn't say it's quite a matter of form. I'd say it's more a matter of what the legislative body did. Okay. I hear you. I hear you. And I appreciate that maybe it's stacking the deck in a way to call it form. But I guess I'm still wondering why would we say this? Why would we say that by choosing to put the sentence enhancement in one place in its statutory scheme rather than in another place, the New York state legislature has done something that should be read in reading, in interpreting the guideline provision for which the New York state legislature is not responsible? And why should we read it differently, depending on how New York state, read the guideline differently, depending on how New York state chose to characterize its sentence enhancement? The only answer that I can give you, which I think is a good answer, is that the guidelines themselves have specific language and a specific structure. And that's where this court should begin following what this court in other areas tends to do, which is to follow a categorical approach. Simple question. Is this an offense punishable by more than 20 years? Answer, no, it's not reckless manslaughter, class C nonviolent felony. It's punishable by a maximum of 15. Move on. Now, is that going to resolve every single question under every single statute? It's not, but it will resolve this question under the statute. And second, very, very briefly, I just want to turn to the procedural unreasonableness of the sentencing proceeding itself. I'm not going to repeat everything that I said in my brief, but suffice it to say that everything that happened in this case and the way that it happened, happened precisely because the This was not the United States versus Kareem Smith, where there was a very clear focus on the prior sentencing proceeding without excessive discussion about the underlying conduct. This sentencing proceeding from the beginning, from the time the probation department report came out on December 9th, which we received, I think on December 10th, said the only offense, arguably more serious than this reckless manslaughter would be the intentional murder of a police officer. The court endorsed that particular report, accepted it in its entirety, and everything else that followed at the sentencing proceeding tracked the specific horrors of the crime underlying offense itself. It's sequelae. It's what it's done to people. And notwithstanding the fact that the district judge kept saying, oh, this is not about the underlying offense. Everything that was done in that courtroom was exactly about it. I hear what you're saying, Mr. Kubey, but what puzzles me is, you're right. The district court said these things. It was following the approach that we've told district judges to apply. So are you saying that once the judge made the decision to hear from the underlying victims' families at all, that was error and it's all over? Because what you're focusing on is the fact that he heard those people and here's what they had to say. And I guess implicitly that that must have influenced the court in some improper way or something. But the procedural irregularity, aren't you just saying that he should not have heard from those people? No, no, no. But once he did that, you see, don't we have this situation that you're complaining of that now in terms of the number of transcript pages, the amount of time, the amount of emotion in the room, that altered everything? That's what happened in this case. That's not what had to happen in this case. And second, that was not the only thing that happened. I mean, we see from the record that before we even showed up, the judge had done some extrajudicial sleuthing, had determined that the PBA was very unhappy with Ms. Ramos' parole and it claimed unfairness. And the judge on December 10th, based on that, made the preliminary determination that, yes, indeed, he's going to hear from anybody and everybody who wants to speak in that courtroom. You have the probation department report ginning up this sort of almost obscene conflation of Ms. Ramos' crime with intentional murder of a police officer. Mr. Kubey, I'm sorry to interrupt you. I'm sorry to interrupt. But I mean, is it your view that the victims or the family members had a right to speak under the Victim Rights Act? And could the judge have just said, I don't want to hear from you? I think that's an unresolved question. Honestly, Judge Sullivan, I think that it certainly can make an argument that they had the right to be heard to a limited extent, to an appropriately cabined extent. But in any event, that was the decision that the district court made before any showed up. So with nothing else, unless the court has more questions, I will be quiet. All right. Well, you've reserved three minutes for rebuttal. Yes. So, Ms. Mace, are you there? I didn't get to ask you because as I would have asked you that, I wasn't there. But are you there? I am. I am here and I can see all three of your honors. Thank you. Good. All right. And I can see and hear you. So that's a step up. So go ahead. You've got 10 minutes. Thank you. And may it please the court. My name is Kristen Mace and I'm an assistant U.S. attorney in the Eastern District of New York. I also represented the government in this matter before the district court. The judgment should be affirmed in this case because of the district court did not err, let alone commit plain error in imposing a 24-month sentence for Betsy Ramos' breach of trust in committing a new crime after then district court Judge Raggi imposed a lenient sentence for Ramos' federal drug trafficking crime. I'll follow the structure that Mr. Cooby used and start with the question of the grade of the violation, as this is the primary issue on appeal raised by Ms. Ramos. The grade of the violation is determined by Section 7B1.1A1. And at a minimum, the district court's adoption of the PSR's this was a grade A violation was not error under the second prong of that provision that states that any crime or offense punishable by a term of imprisonment exceeding 20 years is a grade A violation. So are you conceding that this is not covered by, it's not a crime of violence? Your Honor, the government has not asserted in this appeal that it's a crime of violence. We know that that would be an uphill battle as the current state of the case law, particularly because we recognize that in United States v. Scott, this court determined that first degree manslaughter is not a crime of violence, has not yet decided whether second degree manslaughter is, but I know that would be a tough argument right now. I do note that the Supreme Court has granted cert in a case, Borden v. United States, where it will potentially determine whether crimes with a recklessness mens rea can be crimes of violence. So it may be that this area of the law will continue to evolve. I will note that this indicates there was no plain error on the district court's part because there's no settled law. Oh, well, well, well, but really, I mean, manslaughter one is equivalent to voluntary manslaughter. It's not a question of whether a recklessness crime could be a crime of violence. Of course, it could be, I suppose, and that's a legal question. And and some of the Supreme Court might decide it a different way. But the issue here is that that provision that you were relying on, everyone was relying on below, refers to voluntary manslaughter as being categorically a crime of violence. And this is not voluntary manslaughter, as any common law court would understand that term. It's a different kind of crime, right? Yes, Your Honor. And as I've said, the government has not. OK, so we're relying here exclusively on whether it's a concession or whatever the government's position might be in another case. In this case, the only issue before us that would, in the government's assertion, save the class, a classification is the provision about an offense punishable by more than 15 years. Is that right? By more than 20 years, Your Honor. 20 years. I'm That is the argument the government is asserting in this appeal, because it's very clear. It is clear that she did face a or she did commit an offense punishable by a term of imprisonment exceeding 20 years. That's not only clear because of her sentence of 22 years or the fact that she served 22 years, but also because of the the case law in this area. And one point that I do want to appellant in the briefing. All of the circuits to have decided this issue have found that the court should consider the any recidivist enhancement as part of the maximum possible term. The appellant cites Garcia Cartagena from the First Circuit. It's the government's position that the appellant has misread that case. In fact, the First Circuit in that decision made clear that it was not considering subsection B or the question of the length of the possible term of imprisonment, but was rather deciding whether the offense was a crime of violence and what standards should be used in determining if it was a crime of violence at the court made clear that the question of the length of term or subsection B was not relevant at all to that appeal. And so if you look at the cited in the government's brief from the 7th, 3rd, 4th, 6th, 10th, and 9th circuits, they all determined that the recidivist enhancement should be considered as part of the offense. And it's important to look to the first of these cases, Trotter from the 7th Circuit and the reasoning there. The appellant urges this court to follow Lee. That's the 7th Circuit decision that predated Trotter and which Trotter overturned. But that wasn't open to the 7th Circuit because as the 7th Circuit explained in Trotter, the result was determined by the Supreme Court's decision in U.S. versus Labonte. So Lee was decided in 1996. One year later, the Supreme Court decided Labonte in 1997. And then Trotter, the 7th Circuit, made clear that it needed to follow the reasoning from Labonte and it controlled in this circumstance as well. Labonte concerned another provision, section 4B1.1 of the guidelines, having to do with career offender status. And in that context, the Supreme Court considered all of the arguments that appellant is making here before this court and rejected those and made clear that the court must consider everything that goes into the potential sentence, including recidivist enhancements in determining what the maximum possible penalty was. Now, the appellant argues this is double counting or that somehow there should be a distinction between the offender and the offense. The Supreme Court dealt with that issue in Labonte and Trotter adopted, as it must, the reasoning from Labonte and applying it in section 7B1.1 as well. And so all of the cases that have then followed from the circuits that I listed earlier have adopted this reasoning and concluded that the recidivist enhancements that a possible maximum term of imprisonment for an offense should be considered in determining whether which grade the violation falls within. Some of those cases concern the distinction between less or more than one year. Some of them concern more or less than 20 years, but it's the same the maximum possible sentence and the courts have all determined that there are. Unless the court has any questions about that, I'll move briefly to the second argument from the appellant today with regard to the focus of the district court's decision. The district court heard argument from both parties and extensive briefing on the breach of trust issue. The underlying cooperation agreement, the details of the underlying sentencing and noted and relied heavily on the fact that Ms. Ramos was sentenced very leniently by then district court judge Radji. She faced a five-year mandatory minimum sentence and a guidelines range of 151 to 188 months and was before Booker. In that context, the government moved under section 5k 1.1 for a sentence below the mandatory minimum and below the guidelines and placed its trust in Ramos based on her cooperation. Judge Radji heard argument on that and granted the request to sentence Ms. Ramos below the guidelines and the mandatory minimum and placed great trust in her in doing so. It was a result of that trust that Ms. Ramos was out and committing more crimes and committed this crime that led to the violation for which she was sentenced. That was a focus of the government's argument before the district court and the district court noted in sentencing that he was not Ms. Ramos on the underlying crime that had been done by the state court but rather was sentencing Ms. Ramos for her breach of trust. It was entirely improper in that regard and if the court has unless the court has any questions with regard to the other arguments raised by the appellant in this case, we'll just ask that the the judgment of the district court be affirmed for the reasons stated today and in the government's papers. All right, thank you. Mr. Kubi, we'll hear from you for three minutes in rebuttal. Thank you. First is to me the lenient or very lenient sentence that's alleged that Judge Radji imposed on Ms. Ramos. It's almost this is like Schrodinger's sentence. It's both very lenient or it's very substantial depending on the judge construing it because it was that sentence which is now being described as lenient, very lenient, a gift, etc. that was the primary basis in the state court for imposing the 15 to life term as a persistent felony offender. The judge there noting that Ms. Ramos apparently had not learned her lesson after being given a very substantial term in prison. Second, I do agree that the case law as it's evolving under Borden, which has not yet been argued, may lend different guidance to this court about reckless manslaughter, but right now we're simply not there. Third, whether there's a circuit split or not depends upon how finely you choose to slice this particular onion. It's absolutely true that Garcia-Cartagena was not focusing on subsection B but rather subsection A, but nonetheless it did what this court has frequently done which is to take a categorical approach and under at least as a gateway as a threshold matter and it decided that case under that categorical approach. If this court were to do that here, of course, this would not be an offense punishable by more than 20 years in prison. As to the procedural aspect of the case, you know, Judge Sullivan, you wrote for the panel in United States v. Smith and I think imagine, if you will, the following that instead of what happened in Smith actually happening, what happened in Ramos happened in Smith where the probation department said this second-degree possession of a weapon was arguably just as serious as the intentional murder of a police officer. Suggested that cast aside and there should be more emphasis on the specific crime because the crime was so horrible. In addition, the courtroom was packed with gunshot victims who not only appeared there as spectators but were sort of specifically introduced en masse to the court and then the court heard repeatedly from the friends and co-workers and family members of the injured party who talked about his moral purity, his goodness, his godliness, all the while cursing at the defendant who inflicted that wound in the first place. I'm sorry, Mr. Covey, you're still going back to what all those people in the courtroom did. Isn't the question what the judge did and, you know, don't you have to be saying that this influenced the judge, that the judge, in effect, did not do what the judge said he was doing but instead was relying on something else? It's not, you know, the fact that these people said these things, the judge pretty much said, I can't really rely on that, didn't he? Well, yes, that's exactly what the judge said. In other parts, however, the judge, you know, after he spoke right after the rest of them talking about this was perhaps his saddest day on the bench because he couldn't give adequate comfort to the victims of the underlying offense who testified. I mean, is that inappropriate for a judge to say, I mean, the problem is he's got these people who are very emotional, quite understandably, quite correctly about what they experienced. And, you know, what I'm puzzling over, I mean, I understand that it's a hard thing for a court to do, it's a hard thing for a lawyer even to do, to say, you know, what you have to do in this case, Court of Appeals, is hold that the district judge was disingenuous in the sentence he imposed. But if you're not saying that, I have trouble understanding what the problem is because I would feel obliged if I were the judge, regardless of what I wanted to do, even if I decided to say, time served, because Ms. Ramos has changed over the years, or whatever the outcome was going to be, it seems only respectful to give that comfort to victims of the underlying crime. I'm not sure I see why that's inappropriate. I'm sorry, Judge, if I was unclear. I do think the district court was being completely disingenuous. I think the district court, based on its extrajudicial sleuthing and its desire to decided to conduct these proceedings in this fashion, knowing full well what this was going to be, even the government concedes that he was appropriate, given the tone, the emotional tone of the room, an emotional tone that had been entirely created by the judge and the government, and the predictable thing happened. Oh, I think he was completely disingenuous, with all due respect. All right. Why don't we leave it there? Thank you both. We will reserve decision, but very well argued. We'll now move to the last case on the calendar for today, for argument. That's Francis v. Commissioner of Correction.